UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ROWAN COMPANIES INC., ET AL                          CIVIL ACTION

VERSUS                                                        No. 05-30

GREATER LAFOURCHE PORT                         SECTION "K"(2)
COMMISSION, ET AL.

## ORDER

Before the Court are several Motions for Summary Judgment brought by various parties

in the instant matter.  The outstanding Motions, taken in numerical filing order, are as follows:

1.   **Rec. Doc. No. 96: Motion for Summary Judgment by defendant Core Industries seeking dismissal of all claims by plaintiff Rowan Companies ("Rowan") and defendants Continental and the Greater Lafourche Port Commission ("Port").**

2.   **Rec. Doc. No. 98: Motion for Partial Summary Judgment by plaintiff Rowan against Continental finding Rowan to be a beneficiary of a stipulation *pour autrui* of the contract between defendants Continental and the Port.**

3.   **Rec. Doc. No. 99: Motion for Partial Summary Judgment by Continental against Rowan on Rowan's Third-party beneficiary claims.**

4.   **Rec. Doc. No. 101: Motion for Partial Summary Judgment by Continental seeking dismissal of any claims that it had a duty to log piles.**

5.   **Rec. Doc. No. 103: Motion for Partial Summary Judgment by Continental seeking dismissal of the Port's cross-claim.**

> **6.**     **Rec. Doc. No. 105: Motion for Partial Summary Judgment by the Port seeking summary judgment in its favor on its cross-claim against Continental that Continental materially breached its contract.**

**Facts:**

This lawsuit stems from a construction operation at Port Fourchon, Louisiana.  On October 2, 2000, co-defendant the Greater Lafourche Port Commission (the "Port") the Port hired defendant J.Wayne Plaisance ("Plaisance") as the structural engineer for construction of a newly developed 36 acre offshore service facility known as the Northern Expansion Development of Port Fourchon.  Plaisance was hired to provide engineering services in connection with the planning, design and engineering of the project, including a steel bulkhead.  Plaisance in turn hired defendant Eustis Engineering Company, Inc. ("Eustis") to perform a geotechnical investigation examining the subsoil stratification and the physical properties of the various substrate existing in and around the construction site.  During the course of this planning and construction, the Port invited plaintiffs Rowan to lease lots 2 and 3 in the newly developed facility.  Rowan apparently  was uninterested in leasing the property unless the Port first secured contractors to build a steel bulkhead such that any agreement between Rowan and the Port required the construction of a steel bulkhead and channel dredging in front of the bulkhead to completed, with the resulting slip having a depth of 23 feet and a width of 700 feet.

On December 12, 2002, GLPC and Rowan executed a Contract of Lease for the Leased Premises.  Earlier, on March 5, 2001 the Port had accepted a bid of Continental Construction Company ("Continental") for the construction and installation of the bulkhead on the Leased Premises, executing a contract for this work whereby Continental was to construct the improvements, including the driving of pilings and construction of the bulkhead.  Between April

2001 and March 2002 the steel bulkhead was constructed by Continental per the design and engineering specifications provided by Plaisance.  Upon completion of the bulkhead, Rowan occupied the facility, under lease as of April 2003.

While the Port and Continental were making the above improvements, Rowan also began to make improvements upon their leased premises through its contractor, R&S Construction, LLC.  One of these improvements required the purchase from Vulcan Materials Company ("Vulcan") of several tons of limestone aggregate to be used as fill on the leased premises. Between June 14, 2003 and December 27, 2003 the limestone was delivered to Rowan's premises via dumb barge and offloaded by crane mounted on a companion deck barge sitting in navigable waters running alongside the steel bulkhead.  These discharging operations, including control and operation of the crane, were performed by defendant Core Industries ("Core"). Vulcan engaged Core to discharge the limestone via a clam-shell bucket-equipped duty cycle crane mounted on a work barge, which was transported to the work site by Vulcan with its flotilla of rock barges.  Core crane operators allegedly were to make contact with Rowan's representatives who would in turn identify the individual responsible for directing all cargo discharge operations.  A filter cloth was to be placed on the area where the limestone was to offloaded and Core's crane operator was to deposit the limestone aggregate only on this designated area.  Core claims it was not involved at all with the placement of the filter cloth or the decision of where to place the stone, but rather was retained solely to discharge the limestone as directed.

On January 14, 2004 a ten-inch horizontal deflection in the bulkhead was discovered.  On or about January 21, 2004 the Port informed Rowan that an inspection of their facility revealed

3

unacceptable conditions, all stemming from an inadequate bulkhead system.  Given the risks associated with continued operations on the bulkhead, Rowan discontinued use of the facility. On January 5, 2005 Rowan filed suit against numerous defendants, alleging that the "capacity of the bulkhead was inadequate for the intended conditions and did not meet design specifications." In its claim against Continental Rowan alleges, *inter alia*, that Continental's construction and installation of the bulkhead was defective and that Continental failed to document its construction activities in a thorough and competent manner, thereby contributing to Rowan's damages.  Defendant Core was charged with negligence for discharging the limestone aggregate into large piles of the leased premises without inquiring into the capacity of the premises to handle the loads generated by the weight of the rock.  On January 14, 2005 the Port filed a cross-claim against Continental for breach of Continental's obligations under their contract, as well as a breach of the standard of professional care.  The Port sought damages including the cost incurred in repairing the bulkhead system, and the cost incurred in hiring engineering and geo-technical consultants and other experts.  On March 30, 2005 Continental filed its own cross claim against the Port, adopting all allegations set forth by Rowan in its complaint against the Port, as if an action seeking contribution from the Port.   Finally, Rowan now claims that as it was always the party that the Port intended would use the bulkhead, and Continental knew it was being constructed for Rowan's use, that Rowan is a third-party beneficiary of Continental's contract with the Port.

The various parties now move for summary judgment as detailed in the list of motions above.  In the interests of efficiency and logic, the Court has grouped those motions which are most related to each other and will analyze each group in turn, as follows.

4

**Legal Standard:**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *See Stults v. Conoco*, 76 F.3d 651, 656, (5th Cir. 1996) (*citing Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 912-13 (5th Cir. 1992) (*quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. The nonmoving party must come forward with "specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) (emphasis supplied); *Tubacex, Inc. v. M/V  Risan*, 45 F.3d 951, 954 (5th Cir. 1995).

Thus, where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). Finally, the court notes that the substantive law determines materiality of facts and only "facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**Analysis:**

> **A.      Motion for Summary Judgment by Core seeking dismissal of all claims by Rowan, Continental, and the Port[1]  (Rec. Doc. No. 96)**

Core now re-moves for summary judgment on all claims against them.[2]  Discovery is now closed and according to Core, the completed evidentiary record establishes that (1) Core exercised no measure of discretion in where or how high to stockpile the limestone; (2) Core did not deviate from Rowan's specification or instruction on how and where to discharge the limestone; and (3) there is no evidence that Core had reason to believe performance of their charge would create a hazardous or defective condition or otherwise cause damage.

Briefly, defendant Core is charged with negligence in Rowan's Complaint for discharging the limestone aggregate into large piles of the leased premises without inquiring into the capacity of the premises to handle the loads generated by the weight of the rock.  Core contends it was under no such duty and did not deviate in any way from the instructions and specifications provided by R&S Construction, Rowan's contractor.  Because Core had no reason to believe that discharging the limestone in strict compliance with the instructions furnished to them might lead to a dangerous condition Core is immune from claims of third parties pursuant to La. R.S. 9:2771.  Contrary to Rowan's assertions in its Complaint, Core was under no duty to place the filter cloth in the designated area, analyze vertical load limits, and/or perform any

---

[1]The instant motion is a re-urging of motion originally heard April 5, 2006, see Rec. Doc. No. 60.

[2]Both the Port and Continental have filed similar cross-claims against Core advancing essentially the same arguments. Core moves for summary judgment on these claims as well.

engineering to ensure the limestone was offloaded within the design parameters of the bulkhead.

Core is a materials handling corporation charged with materials handling alone.

Core contends it is immune under La. R.S. 9:2771 which provides:

No contractor shall be liable for destruction or deterioration of or defects in the work constructed, or under construction, by him, if he constructed, or is constructing the work according to plans or specifications furnished to him which he did not make or cause to be made and if the destruction, deterioration, or defect was due to any fault or insufficiency of the plans or specifications.  This provision shall apply regardless  of whether the destruction, deterioration, or defect occurs or becomes evident prior to or after delivery of the work to the owner or prior to or after acceptance of the work by the owner.  The provisions of this section should not be subject to waiver by the contractor. La. R.S. 9:2771

Core contends that under La. R.S. 9:2771, an independent contractor cannot be held liable for any alleged damage if the contractor constructed the work according to plans or specifications furnished to him.  Louisiana appellate courts have extended the statute's immunity to third-party tort claims when the contractor can prove it had no justifiable reason to believe adherence to the plans and specifications would create a dangerous condition.  *See Nolan v. S&W Steel Fabricators*, 600 So.2d 929, 932 (La. App. 2nd Cir. 1992); *Arnold v. Our Lady of the Lake Hosp.*, 562 So.2d 1056, 1058 (La.App. 1st Cir. 1990); *see also LeBreton v. Brown*, 277 So.2d 645 (La. 1973)(finding that a contractor who had constructed certain improvements to real property according to the plans and instructions supplied to him not liable for damages suffered by the property owner).  Core was not apprised of the design specifications of the wharf apron. Core was simply told how and where to discharge the limestone cargo.  Moreover, Rowan cannot show that there is a material issue of fact with respect to whether Core had reason to believe that working in accordance with plaintiffs' plans would create a hazardous condition, a showing required to defeat a summary judgment motion brought under La. R.S. 9:2771.  *See*

7

*Rosato v. Louisiana Dep't Transp. and Dev.*, 714 So.2d 862, 867 (La. App. 4 Cir. 5/27/98). Rowan has made no allegations or produced any evidence that a deviation from specifications occurred. Core followed the instructions of Rowan to a "tee" and was never consulted by Rowan as to the stockpile layout or monitoring plan designating the load capacity of the bulkhead system. Core was not consulted at all. Thus Core had no reason to believe that Rowan's specifications would create a hazardous or defective condition or cause damage.

Finally, the sworn testimony of crane operator Teddy Downer establishes that Core was under no duty to determine whether the loads placed would be within the parameters required. Mr. Downer's deposition testimony establishes that he was shown the precise spot to place the stockpile of stone, see Downer Dep., p.38; the bulkhead did not deflect out at any time while he was discharging the stone, id. at 29; he relied on the fact that Rowan Marine knew of the load capacity of the site, id. at 37-38; and he placed stone exactly where he was told to place it, id. at 67. Without any reason to believe that discharging the limestone aggregate in strict compliance with the instructions furnished by Rowan might lead to a dangerous condition, Core should be held statutorily immune. See *Rosato v. Louisiana Dep't Transp. and Dev.*, 714 So,2d 862, 867 (La.App. 4 Cir. 5/27/98)("[T]o avoid summary judgment . . . it was then incumbent on plaintiffs to show that there is a material issue of fact with respect to whether the contractors had reason to believe that working in accordance with [the plans] would create a hazardous condition."). Essentially, Rowan fails to offer any evidence that Core had reason to believe performing their charge would create damage, and there is no evidence that Core improperly discharged the limestone on the wharf apron. See Exhibit "F"–Plaintiff's Expert Report, dated April 21, 2006

(concluding that if the bulkhead had been properly *designed* (Plaisance) and *installed* (CCC), the limestone mound would not have caused the failure).

In opposition, Rowan alleges that the limestone aggregate was "delivered and discharged upon the leased premises without concern for the design limitations of the leased premises," and Core should have known "that the vertical loads in amounts greater than those permitted by the design parameters governing loads on the leased premises would cause damage to the premises and economic injury to plaintiffs."  Rowan alleges Core should have determined whether the loads placed upon the premises would be within the parameters required of the bulkhead system, and the amount of limestone placed by Core did indeed exceed the bulkhead's design limitations. Essentially,  Rowan claims Core's negligence contributed to the bulkhead's failure. Importantly, Rowan also claims that any "plans or specifications" with respect to how much aggregate to place in each pile of limestone or how to pile the limestone, plans required to invoke statutory immunity, simply do not exist and thus Core is not immune.

First Rowan argues that maritime law applies and thus forecloses application of the affirmative defense of La. R.S. 9:2771.  Rowan argues that Core's liability for damaging the bulkhead resulted from a tort committed while a flotilla of barges, operating on navigable waters, were being unloaded by a crane mounted on a barge, also operating in navigable waters.  As such, Rowan's claims against Core fall within admiralty jurisdiction.  *See Lakes of Gum Cove Hunting & Fishing, LLC* v. *Weeks Marine, Inc.*, 182 F.Supp. 2d 537, 543-44 (W.D.La. 2001)(stating that "[a]ny injury to property consummated on land when caused by a vessel on navigable waters is within admiralty jurisdiction.").  Core's affirmative defense of La. R.S. 9:2771 conflicts with maritime law.  Because admiralty law applies, and maritime law does not

9

recognize the immunity defense raised by Core, instead providing for a general basis for tort liability based upon proof of negligence and requiring a defendant to owe a legal duty to a plaintiff for negligence that causes damage to plaintiff, Core's affirmative defense is irrelevant. Stated another way, the adequacy of any plans and specifications allegedly provided to Core by Rowan would only come into play in apportioning fault and not, as Core would like, to bar Rowan's claims against Core altogether.  Maritime law recognizes no immunity for contractors.

Secondly, Even if La.R.S. 9:2771 applies, genuine issues of material fact remain which preclude entering summary judgment because Core has failed to establish that it is entitled to assert statutory immunity.  Rowan states Core has failed to meet its threshold burden in establishing that no genuine issues of material fact exist, as the requisite "plans or specifications" which trigger the statute's applicability simply were not furnished.   Deposition testimony and Core's self-serving affidavits do not suffice.  First, the affidavits provided do not state that plaintiff or any of its contractors ever specified *how much* aggregate to place in each pile nor does Core contend that plaintiffs ever specified *how high* to pile the aggregate.  Accordingly Core has failed to point to any plans of specifications furnished to it which it did not make or cause to be made, as required by La. R.S. 9:2771.  Furthermore, Core's affidavit evidence merely asserts that plaintiffs specified *where* to place the aggregate but it was Core's personnel who determined *how much*  aggregate to place in each pile and *how high* to pile it.  When Core first moved for summary judgment, it attached the affidavits of one of its crane operators, Edward Netto, and a dispatcher, John Watson, to support its claim that Core strictly complied with the plans and specifications provided to it by Rowan.  After these witnesses were deposed, it was

10

discovered that neither witness had any specific knowledge of what instructions, if any were provided to the Core crane operator, Teddy Downer.

Downer has only recently been located and deposed, and contrary to Core's characterizations, Continental argues that his testimony reveals that Mr. Downer was given no instructions with regard to how high the stockpile should be, see Downer Dep., p.47, but rather unloaded nearly 5,000 tones of stone all into one pile, id. at 16, 23, 47.  Thus, Core ostensibly relied upon *its own specifications* in determining how high to pile the limestone it was discharging.  Under La.R.S. 9:2771, a contractor is only entitled to immunity if the plans and specifications causing the destruction were provided *to* the contractor, not devised *by* the contractor.  The evidence suggests that it was the unilateral (Core) decision of Downer to stockpile the limestone to the height that he did.

Additionally, under the statute, a contractor cannot rely blindly on plans and specs.  A contractor must also prove that the condition created was not hazardous or that it had no justifiable reason to believe that its adherence to the plans and specs created a hazardous condition.  *See Bernard v. State*, 640 So.2d 694, 700 (La. App. 3d Cir. 6/1/94), *writ denied*, 643 So.2d 165 (La. 1994).  Core has submitted no evidence to explain why Core took no steps to protect against the possibility of damaging the bulkhead when it discharged the limestone.

**Holding:**

The Court finds that Core's Motion for Summary judgment must be denied because genuine issues of material fact still exist.  While nearly 3000 feet of bulkhead was constructed, the *only* failure occurred along the several hundred-foot section wherein the stone aggregate loads were placed by Core.  Continental alleges the bulkhead failure occurred shortly after the

last loads were discharged in December, 2003.  While Core's claim is that it simply did what it was told to do, and thus is covered under La. R.S. 9:2771, the Court finds that Core's blind compliance with any directives it operated under do not relieve Core of its obligations to unload the significant volume of stone in a safe and prudent manner.

Given the facts before the Court, especially the testimony of Mr. Downer, it is still uncertain as to what extent Core's involvement in the bulkhead's construction should lend liability.  Regardless of whether La. R.S. 9:2771 or maritime law applies, the Court finds that genuine issues of material fact still exist as to Core's role, including, *inter alia*, Core's experience in materials handling, the directives, if any, under which Core (through Mr. Downer) operated, the applicable standards of care governing materials handling and discharging on or near bulkheads, what Core knew or should have known relative to its role in discharging millions of pounds of stone aggregate upon the bulkhead and any resultant hazardous conditions, the locations of the loads, whether Mr. Downer was told to spread the limestone and instead actually stacked it, etc.[3]

The Court finds that whether Core, a large materials handler, knew or should have known that unloading certain loads in given conditions could create an overload risk is an issue of fact for the jury.  The evidence reveals that Downer was the one who received instructions, if any, as how to deliver the limestone (and, in fact, there is some contention he was told to spread, not stack, the limestone, and that he complained about it).  Particularly, the loads delivered earlier in July through September 2003 were delivered directly into trucks and/or were promptly spread

---

[3]Due to the abundant factual discrepancies, the Court need not address at this stage whether maritime law applies, as Core has failed to carry its burden on summary judgment.

about the property–whereas the loads in December 2003 and January 2004, immediately before the failure occurred were stockpiled to at least 30 feet high on the small portion of the bulkhead that eventually failed.  Accordingly, given the present posture of the facts now that discovery has closed, the Court will deny the motion.

      **B.**    **The Third-Party Beneficiary and "Material" Breach Motions, to wit:**

            **1.**    **Rowan's Motion for Partial Summary Judgment against Continental as Rowan is the beneficiary of a stipulation *pour autrui* of the contract between Continental and the Port, and that Continental materially breached the Contract (Rec Doc. No. 98)**

            **2.**    **Continental's Motion for Partial Summary Judgment against Rowan on Rowan's third-party beneficiary claims (Rec. Doc. No. 99)**

            **3.**    **The Port's Motion for Partial Summary Judgment seeking judgment in its favor on its cross-claim against Continental that Continental materially breached its contract[4] (Rec. Doc. No. 105)**

Rowan claims that because it was always the party that the Port intended would use the bulkhead, and because Continental knew the bulkhead was being constructed for Rowan's use, then Rowan is a third-party beneficiary of Continental's contract with the Port such that Rowan is entitled to recover damages for any breach by Continental of its contract with the Port.  Rowan argues that it was only after the Port was able to guarantee that the bulkhead would be built that Rowan entered into the lease agreement with the Port, and that a condition of the lease, as embodied in the lease itself was the exact construction and specification of the bulkhead.  See

---

[4]The Port adopts all of Rowan's arguments against Continental; similarly Continental's Motion for Partial Summary Judgment applies equally as a response in opposition to the Port's breach of contract motion.

Exhibit D, June 21, 2001, agreements between Rowan and the Port.  Rowan alleges that Continental not only knew it was constructing the bulkhead for the Port on behalf of Rowan, but also that its failure to do so would subject it to liability.  See Exhibit A, CCC000070.  Rowan alleges that both the Port and Rowan did not get what they paid for—Continental was paid almost $6 million to build a first quality bulkhead which would allow Rowan to operate a state of the art offshore service facility.  However, instead Continental delivered a poorly constructed bulkhead that required complete repair.  Had Continental done its job, neither the engineer's use of improper soil data nor Core's improper placement of limestone aggregate would have caused the bulkhead to fail.  Rowan submits it was the failure of their one portion of the bulkhead that led the entire bulkhead to be investigated, revealing that the entirety of the slip had been defectively constructed by Continental.  Rowan claims that not only is it a third-party beneficiary of the contract between Continental and the Port but also that Continental materially breached that contract.

       To maintain its argument Rowan looks to Louisiana law, specifically arguing that it is the beneficiary of a stipulation *pour autrui*.  Rowan argues that the Port, as promisee, and Rowan, as the third-party beneficiary, entered into a legal relationship (their lease agreement) which involved the obligation that a steel bulkhead and channel dredging would be completed, and that the promisee would make all repairs necessary.  The bulkhead was designed and constructed exclusively for Rowan's use, and the bulkhead contract contains an indemnity provision expressly holding the Port harmless for all claims arising from Continental's work.  *See Dartez v. Dixon*, 502 So.2d 1063 (La. 1987) (holding that a contract containing an "indemnity for

liability" clause confers a benefit in favor of third parties).  But for Rowan, the Port would never have commissioned Continental to build the bulkhead.

Assuming Rowan's Third Party status, and Continental's failure to perform, Rowan further argues it is entitled to Partial Summary Judgment on its Breach of Contract claims against Continental.  The Port and Continental reduced their agreement to writing and the writing clearly set forth Continental's obligations, which Continental then breached.  According to Rowan, Continental's substandard performance not only breached the agreement but it was also a breach of the obligation under La. Civil Code Art. 2762 to complete the project in a good, workmanlike manner, free from defects either in materials or workmanship, and summary judgment in favor of Rowan on these claims is called for.  *See, e.g., Wurst v. Pruyn*, 202 So.2d 268 (1967).

In rebuttal, Continental argues first that Rowan fails to demonstrate it is entitled to third party beneficiary status.  Continental argues that a stipulation *pour autrui* is never presumed; rather there must be a clear manifestation of intent to benefit the third party, and that no manifestation of intent or explicit provision conferring a benefit on Rowan appears anywhere in the construction contract between Continental and the Port.  Specifically, no part of the bid advertisement or construction contract issued in late 2000 ever mentioned Rowan, its lease, or its operation.  Tellingly, Continental  was awarded the bid on March 5, 2001 but Rowan's lease was not finalized until December 2002, with Rowan beginning negotiations with the Port in June, 2001.  In addition to the timing, the form construction contract between the Port and Continental does not contain any language or provisions that confer or allude to confer a benefit on Rowan or any third party.

15

Finally, Continental points out that any incidental benefit to Rowan is insufficient under the law to establish third party rights to the contract.  *See Fontenot v. Waste Management of Lake Charles*, 493 So.2d 904 (La. App. 3rd Cir. 1986); *Wagner & Truax Co., Inc. v. Barnett Enterprises, Inc.*, 447 So. 2d 1255 (La.App. 4th Cir. 1984).  Continental argues that under the law, the existence of a stipulation depends upon the promisee's intention to confer a benefit upon a third party and the promisor's (in this case Continental's) agreement to do so.  Even if the Port intended to confer a benefit on Rowan, Continental, as promisor, *never* agreed to do so.  the Port entered into the construction contract with Continental, the Port had no idea who would ultimately become the future tenant.  The Port's consideration was to obtain bulkhead improvements, and CCC's consideration was its desire to construct these improvements for a fee.  Consequently, Rowan was at best an incidental beneficiary.[5]

As to Rowan and the Port's claims for summary judgment on Continental's alleged breach of contract, Continental argues summary judgment is not proper at this time.  Specifically, while Continental has acknowledged certain deviations from the Contract specifications, such as installing piles with a 19,500 ft-lb per blow energy rating rather than the 15,000 ft-lb per blow hammer called for and driving piles in excess of or short of practical refusal or tip depth, Continental maintains that none of these so-called breaches were "material"

---

[5]The only evidence plaintiffs have provided as proof that Continental knew it was constructing the bulkhead for Rowan's use is the deposition of Ray Salewsky, Continental's job superintendent who testified that Rowan representatives came out to the job site and introduced itself to him.  Continental only learned of the identity of the future tenant while they were working on the job, a substantial time after they entered into the contract with the Port.  See Deposition of Ray Salewsky, p. 175.

to the contract, and as they are all intensely fact specific and implicate causation, they are not proper issues for a summary judgment motion.

**<u>Holding:</u>**

Contractual stipulations in favor of third persons are favored in Louisiana law and are "specifically authorized in broad terms." *Andrepont v. Acadia Drilling Co, Inc.*, 255 La. 347, 357 (La. 1969).  La.Civ. Code Art. 1978 provides that parties "may stipulate a benefit for a third person called a third party beneficiary," and "[o]nce the third party has manifested his intention to avail himself of the benefit, the parties may not dissolved the contract by mutual consent without the beneficiary's agreement." *Id*.  The question of whether a stipulation *pour autrui* exists is a "question of what was the intention of the parties, and that intention must be gathered, just as in the case of any other contract, from reading the contract, as a whole, in light of the circumstances under which it was entered into." *Allen v. Curry Mfg. Co. v. Shreveport Waterworks Co.*, 37 So. 980, 984 (La. 1905); *Concept Design, Inc. v. J.J. Krebs & Sons, Inc.*, 692 So.2d 1203, 1206.   Specific factors to be looked at when determining whether a stipulation *pour autrui* exists include (1) the existence of a legal relationship between the promisee and the third party involving an obligation owed by the promisee to the beneficiary which performance of the promise will discharge; (2) the existence of a factual relationship between the promisee and the third person, where (a) there is a possibility of future liability either personal or real on the part of the promisee to the beneficiary against which performance of the promise will protec the former; (b) securing an advantage for the third person may beneficially affect the promisee in a material way; (c )there are kinship ties or other circumstances indicating a benefit by way of a

gratuity was intended.  *See Andrepont v. Acadia Drilling Co., Inc.*, 231 So.2d 347, 351 (La. 1969).

      To establish a stipulation *pour autrui*, there must not only be a third party advantage, but the third party relationship must form the consideration for the contract, and the benefit may not be merely incidental to it.  *City of Shreveport v. Gulf Oil Corp.*, 431 F.Supp. 1, 3-4 (W.D.La. 1975), aff'd 551 F.2d 93 (5th Cir. 1977).  The benefit may not be merely incidental to the contract and the contract must explicitly provide that the direct benefit to the third party constitutes consideration or the condition of the contract.  *In the Matter of the Complaint of Dann Marine Towing*, 2004 WL 744881 (E.D.La. 2004).

      The Court finds that Rowan's Motion for Partial Summary Judgment that Rowan is the beneficiary of stipulation *pour autrui* of the construction contract between Continental and the Port, and further, that Continental materially breached its obligations under said contract must be denied.  Similarly, the Court also denies the Port's Motion for Summary Judgment as to Continental's breach of contract.  Finally, the Court grants Continental's Motion for Partial Summary Judgment and finds, as a matter of law, that Rowan was *not* the beneficiary of a stipulation *pour autrui* of the construction contract between the Port and Continental.

      For the instant case, the timeline is informative in determining whether such a stipulation exists.  Specifically, the Port contracted with Plaisance to design/engineer bulkhead improvements on October 2, 2000.  Over three thousand feet was called for; of which, however, Rowan, would only eventually occupy 700 feet of linear waterfront.  On November 27, 2000, a standard form construction contract and specifications were prepared by Plaisance and bid advertisements were sent out.  On March 5, 2001, Continental was awarded the Construction

Contract by the Port for the "Northern Expansion, Phase I, Part B1(A) Bulkhead Improvements" project.  On June 21, 2001, Rowan and the Port entered into preliminary leasing agreements, and on April 19, 2002 Continental's construction of the bulkhead project was completed.  The Port and Rowan did not finalize and/or enter into their formal lease agreement until December 12, 2002.

Notably, nowhere in the Contract between the Port and Continental is Rowan specifically mentioned; in fact, the deposition testimony produced, while revealing that *perhaps* Rowan was contemplated by the Port as occupier of its space from the beginning of the project (see Testimony of Ted Falgout), also reveals that Continental had no knowledge of Rowan's potential tenancy until well after it had begun construction on the site and Continental's job superintendent, Ray Salewsky, was randomly paid a visit by Rowan's representatives.  See Deposition of Salewsky, p 175.

The cases cited by both parties also fall in Continental's favor.  Specifically, in *Andrepont v. Acadia Drilling Co.*, 231 So.2d 347, 359-60 (La. 1969), while the Louisiana Supreme Court held that a surface lessee was the third-party beneficiary of an oil and gas lease with the owner of the ground, that decision was based on a specific contract provision wherein it was stated that the oil and gas lessee would be "responsible for all damages caused by [the] Lessee's operations."  No such provision exists in the Contract between the Port and Continental.  Additionally, in *Gulf Oil Corp. v. Marine Concrete Structures, Inc.* 464 So.2d 829, 834-35 (La. App. 5 Cir. 1985), the Court upheld third party beneficiary status as to all plaintiffs despite no specific contractual provision designating third-party status, because the Court found that all plaintiffs in that case were to benefit equally from the construction of the facilities involved.

19

The Court, relying on written evidence and testimony by witnesses from both contracting parties, held that the evidence revealed that *both* parties knew of the benefit to all plaintiffs.  Here, however, there is no evidence that Continental ever had knowledge of Rowan's identity as the future tenant; certainly Rowan did not form any basis of Continental's consideration for entering into the contract in question.  Continental bid and entered into its contract with the Port to get paid, and the Court finds that the primary purpose of the Port's contract with Continental  was to improve the entire site, not *just* the portion eventually leased to Rowan over a year later (and almost eight months after Continental was finished construction).

In sum, while completion of the bulkhead may have been contemplated by the Port and Rowan when they entered into their lease agreements, and thus Rowan necessarily was a beneficiary of (and party to) *that* contract, there is *no* evidence, other than loose reference in deposition testimony, that Rowan's third party status was ever a consideration for the contract between Continental and the Port, the contract Rowan now claims under.  A stipulation *pour autrui* is never presumed; under Louisiana law, there must be a *clear* manifestation of intent to benefit the third party.  *See City of Shreveport v. Gulf Oil Corp.*, 431 F.Supp. 1, 3-4 (W.D.La. 1975), aff'd 551 F.2d 93 (5th Cir. 1977).  Additionally, as stated above, to establish a stipulation pour autrui, there must not only be a third party advantage, but the third party relationship *must form the consideration* for the contract, and the benefit may not be merely incidental to it.  *Id.* The existence of a stipulation depends upon the Port's intention to confer a benefit upon Rowan and Continental (as promisor)'s, agreement to do so.  Even if the Port intended to confer a benefit on Rowan, there is no evidence that Continental knew, much less also agreed.

Finally, when the Port entered into the construction contract with Continental, the Port had no legal relationship with the ultimate future tenant, whether Rowan or otherwise.  Further, Rowan eventually leased only one portion of the bulkhead space, whereas Continental's contract with the Port called for completion of the entire Phase I of the Port's Northeastern expansion. Consequently, the Court finds that the Port's consideration was to obtain bulkhead improvements at the most competitive price, and that Continental's consideration was its desire to construct these improvements for a fee.  Rowan was at *best* an incidental–not a third party–beneficiary.

As to claims that Continental be adjudged to be in material breach of contract, the Court finds that these motions must be denied as there remains too many disputed issues of fact as to whether Continental's admitted breaches of certain specifications contained in the Contract were indeed material.  For instance, whether Continental's use of a 19,500 ft-lb hammer rather than the specified 15,000 ft-lb hammer was actually material to the bulkhead's resulting deflection–i.e. *caused* and portion of the bulkhead failure–remains a central factual dispute.  This point is illustrated by the fact that the only bulkhead portion out of 3,000 feet built by Continental for the Port (not all of which was Rowan's) that failed was a discrete section located within Rowan's site, a site where apparently a large amount of stone had been stockpiled on its property, allegedly vastly exceeding the project's intended capacity.  In sum, the evidence provided differs vastly on the cause of the failure, who is responsible and/or whether Continental was in compliance with its contract.  These material factual disputes cannot be resolved on summary judgment.

**C.      Motion for Partial Summary Judgment by Continental seeking dismissal of any claims that it had a duty to log piles (Rec. Doc. No. 101)**

Rowan and the Port have also alleged claims against Continental for breaching a duty to log or record pile blow counts in accordance with the November 27, 2000 contract.  Continental now moves for partial summary judgment on these claims, arguing they had no duty under the contract to do so.  Continental argues that Rowan cannot demonstrate that there ever was a duty on behalf of Continental to log piles.  Principally, Continental argues that any "testing" and/or "inspection" function, such as logging pile counts, are the owner's responsibility  under the contract.  Among other evidence, Continental particularly points to section 13.03(B) of the contract, entitled "Testing and Inspection," which provides that the  "[o]wner shall employ and pay for the services of an independent testing laboratory to perform all inspections tests, or approvals required by the Contract Documents."

Continental also argues that the duty to log pile counts under the Contract cannot fall within any of the Contract exceptions within which the duty may be specifically delegated to someone other than the owner, because the only exception that would apply would be the one which states "except as otherwise specifically provided in the contract documents," and there are no documents which meet this criteria.  Finally, the testimony of Andrew Uzee, a representative for Plaisance, revealed that Uzee, on behalf of Plaisance,  felt it was his responsibility to require that all piles be logged, and it was his mistake for failing to make sure it was done.  See Uzee Deposition, p. 135-38, 170-71.

In opposition Rowan argues firstly that parol evidence should not be allowed by the Court in interpreting the Contract, see La. Civ. Code Art. 2046, and as such the deposition of the

project engineer and his representatives, and their interpretation (even as drafter) of the

provisions should not be credited.  Secondly, the agreement clearly required Continental to log

piles, as set forth in Section 02457, entitled "Submittals" which provides:

> Pile Driving Records
> > Submit driving record of each pile to the Engineer not later than two days after
> > driving.  Include the project name and number, name of Contractor, pile location
> > and number, computed pile capacity, type and size of hammer used, type of pile
> > driving cap used, rate of operation of pile driving equipment, pile dimensions,
> > elevation of point, elevation of butt after cut-off, ground elevations, continuous
> > record of number of blows for each food of penetration, pile deviation, pile uplift
> > and reaction, and any unusual occurrences during pile driving.

Rowan argues that common sense dictates that this pile logging provision applied to

Continental as the construction company.  The language of Section 02457 is not susceptible to

any other reasonable interpretation and Louisiana law forecloses Continental from attempting to

argue ambiguity.  Additionally, Continental's attempt to expand Section 13.03B of the contract

to negate this obligation is without merit.  That provision pertains to "testing and inspection," not

to the logging of pile driving data.  Moreover, 13.03B states that the provision is subject to other

more specific requirements in the contract documents such that the language of section 02457, as

a specific requirement, should control.

## Holding:

Under Louisiana law, the interpretation of an unambiguous contract is an issue of law for

the court.  *See Rutgers v. Martin Woodlands Gas Co.*, 974 F.2d 659, 661 (5th Cir.1992).  "When

the words of the contract are clear and explicit and lead to no absurd consequences, no further

interpretation may be made in search of the parties' intent." La.Civ.Code Ann. art. 2046 (West

1995). In addition, a contract provision is not ambiguous where only one of two competing

interpretations is reasonable or merely because one party can create a dispute in hindsight.  *See*

*Lloyds of London v. Transcontinental Gas Pipe Line Corp.*, 101 F.3d 425, 429 (5th Cir.1996);

*Rutgers,* 974 F.2d at 662.  When the contract is not ambiguous, a court has no authority to reach

beyond the four corners of the document.  *See Huggs, Inc. v. LPC Energy, Inc.*, 889 F.2d 649,

653 (5th Cir.1989).

On the other hand, a contract is ambiguous, under Louisiana law, "when it is uncertain as

to the parties' intentions and susceptible to more than one reasonable meaning under the

circumstances and after applying established rules of construction.*"  See Lloyds of London*, 101

F.3d at 429.  Under these rules of construction, "[e]ach provision of a contract must be

interpreted in light of the other provisions so that each is given the meaning suggested by the

contract as a whole."  La.Civ.Code Ann. art. 2050 (West 1987).  Contract provisions susceptible

to different meanings should be interpreted "to avoid neutralizing or ignoring any of them or

treating them as surplusage," *Lambert v. Maryland Cas. Co.*, 418 So.2d 553, 559-60 (La.1982),

and "to preserve validity [of the contract]," *Gibbs Constr. Co. v. Thomas*, 500 So.2d 764, 769

(La .1987).   Louisiana courts will not interpret a contract in a way that leads to unreasonable

consequences or inequitable or absurd results even when the words used in the contract are fairly

explicit.  *See Makofsky v. Cunningham*, 576 F.2d 1223, 1229 (5th Cir.1978).  "A doubtful

provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of

the parties before and after the formation of the contract, and of other contracts of a like nature

between the same parties."  La.Civ.Code Ann. art. 2053 (West 1987).

The Court finds that Continental's Motion for Summary Judgment must be denied.

Despite Continental's argument to the contrary, Section 13.03 of the Contract between the Port

and Continental provides that the "OWNER" (the Port) would employ and pay for the services of

all inspections or tests except "as otherwise specifically provided in the Contract Documents."

The Court finds that Section 02457 (Bates stamp CCC 000163) of the Contract Documents,

entitled "Heavy Timber and Timber Piling" constitutes such a specific provision.  Continental's

use of parol evidence aside, the Court finds no ambiguity in this portion of the Contract which

itself details additional duties of the Contractor, in this case Continental.  The Court finds that

one of these additional duties was to keep "Pile Driving Records"–in other words, to log piles.

Specifically Continental was to "[s]ubmit driving record of each pile to the Engineer not later

than two days after driving.  Include the project name and number, name of Contractor, pile

location and number, computed pile capacity, type and size of hammer used, type of pile driving

cap used, rate of operation of pile driving equipment, pile dimensions, elevation of point,

elevation of butt after cut-off, ground elevations, continuous record of number of blows for each

food of penetration, pile deviation, pile uplift and reaction, and any unusual occurrences during

pile driving."  The Court finds that by these terms, the language of Section 02457 is not

susceptible to any other reasonable interpretation and there is no ambiguity.  Thus Mr.

Plaisance's deposition testimony and any other evidence, parol or otherwise, is unnecessary.


   **D.     Continental's Motion for Partial Summary Judgment seeking dismissal of
            the Port's cross-claim (Rec. Doc. No. 103)**

        The Port's cross-claim against Continental seeks indemnification and/or contribution

from Continental for its negligence and/or breach of contract in the event it is held liable to

Rowan for damage to the bulkhead.[6]  In its motion for summary judgment, Continental argues that the Port does not allege any contractual rights to contribution or indemnity in its cross-claim, but should the Court so find, any such claim should be dismissed as premature.  See *Suire v. Lafayette City-Parish Consolidated Government*, 907 So.2d 37 (La. 4/12/05)(holding that a contractual duty to defend or indemnify is premature until such time as a determination of liability has been made and the indemnitee has sustained a loss or made payment).   Second, Continental argues that because the Port does not cite to any contractual right of contribution or indemnity, then that leaves the Port to seek contribution and indemnity under only tort theory.  As that right of recovery no longer exists under Louisiana law, the claim should be dismissed, and to the extent the Port is alleging something other than a tort contribution claim, any such claim is also premature and should also be dismissed.  Finally, Continental argues that the Port's cross- claim does not adequately allege a factual scenario under which the Port might be found constructively or derivatively liable.  Consequently, no action for contribution or indemnity would even lie, regardless of whether it was allowed under Louisiana law.  If the Port is deemed to be negligent, then the Port should be held responsible for those related damages.  If Continental is deemed to be negligent, Continental will in turn be responsible for its portion of that negligence.  No allegations made by the Port support a scenario whereby the Port was passively at fault for its role in this matter; rather plaintiff Rowan has alleged numerous specific acts of fault against the Port for which Continental could *not* be held liable, such as breach of

---

[6]The Port Commission has alleged other fault of Continental pursuant to other theories; however only the request for contribution and/or indemnity is the subject of the instant motion, hence the request for *partial* summary judgment.

lease and misrepresentation.  Thus, per La. Civ. Code Art. 2323, the quantifying of any fault is to be left for trial.

**Holding:**

To the extent that the Port is seeking contribution from Continental, the Court finds that such a cause of action fails under Louisiana law.  Since 1996 Louisiana has adopted a pure comparative fault scheme, abolishing solidary liability among non-intentional tortfeasors. Consequently, among joint tortfeasors, one cannot maintain an action for contribution in Louisiana.  See La C.C. Art. 2323 and 2324;[7]  *see also Dumas v. State ex.rel. Dept. of Culture,*

---

[7]Article 2323, entitled "Comparative Fault" provides,

A.    In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable.  If a person suffers injury, death or loss, as the result partly of his negligence and partly as the result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.

B.    The provisions of Paragraph A shall apply to any claim for recovery of damages for injury, death, or loss asserted under any law or legal doctrine or theory of liability, regardless of the basis of liability.

C.    Notwithstanding the provisions of Paragraph A and B, if a person suffers injury, death, or loss as a result partly of his own negligence and partly as a result of the fault of an intentional tortfeasor, his claim for recovery of damages shall not be reduced.

Article 2324 provides, in pertinent part:

A.    He who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act.

B.    If liability is not solidary to Paragraph A, then liability for damages caused by two or more persons shall be a joint and divisible obligation.  A joint tortfeasor shall not be liable for more than his degree of fault and shall not be solidarily

*Recreation and Tourism*, 828 So.2d 530 (La. 10/15/02)("[w]ith the 1996 amendment to Article

2323 and 2324(B) . . . the legislature has effected a total shift in our tort policy . . . Louisiana's

policy is that each tortfeasor pays only for that portion of the damage he has caused and the

tortfeasor shall not be solidarily liable with any other person for damages attributable to the fault

of that other person . . . the right of contribution among solidary tortfeasors also disappeared

since it is no longer necessary in light of the abolishment of solidarity."  The Court finds that any

claim for contribution under a tort theory no longer exists.  Additionally, there has been no

indication that any party *contracted* to indemnify another party and/or contribute to any

judgment.   Consequently Continental's Motion for Partial Summary Judgment seeking dismissal

of the Port's cross-claim will be granted.


     Accordingly,

     **IT IS ORDERED** that Core Industries' Motion for Summary Judgement (Rec. Doc. No.

96) is **DENIED.**

     **IT IS FURTHER ORDERED** that Rowan's Motion for Partial Summary Judgment that

Rowan is the beneficiary of stipulation *pour autrui* of the construction contract between

Continental and the Port and further, that Continental materially breached its obligations under

said contract (Rec. Doc. No. 98) is **DENIED**.

---

      liable with any other person for damages attributable to the fault of such other
person, including the person suffering injury, death ,or loss, regardless of such
other person's insolvency, ability to pay, degree of fault, immunity by statute or
otherwise, including but not limited to immunity as provided in R.S. 23:1032, or
that the other person's identity is not known or reasonably ascertainable.

**IT IS FURTHER ORDERED** that Continental's Motion for Partial Summary Judgment (Rec. Doc. No. 99) is **GRANTED** such that the Court finds, that as a matter of law, that Rowan was *not* the beneficiary of a stipulation *pour autrui* of the construction contract between the Port and Continental.

**IT IS FURTHER ORDERED** that the Port's Motion as to Continental's breach of Contract (Rec. Doc. No. 105) is also **DENIED.**

**IT IS FURTHER ORDERED** that Continental's Motion for Partial Summary Judgment seeking dismissal of any claims that it had a duty to log piles (Rec. Doc. 101) is **DENIED.**

**IT IS FURTHER ORDERED** that Continental's Motion for Partial Summary Judgment seeking dismissal of the Port's cross-claim for contribution (Rec. Doc. No. 103) is **GRANTED.**

Signed this  2nd  day of August, 2006 in New Orleans, Louisiana.

**STANWOOD R. DUVAL, JR.**
**UNITED STATES DISTRICT COURT JUDGE**